UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WARREN EDWARD ENGLISH, III,

                Petitioner,              Case No. 1:09-cv-1012

v.                                   Honorable Janet T. Neff

MARY BERGHUIS,

                Respondent.

_____/

## **OPINION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

**Factual Allegations**

Petitioner, Warren Edward English, III, presently is on parole. Following a jury trial, Petitioner was convicted in the St. Joseph County Circuit Court of third-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520d(1)(c). On April 21, 2006, he was sentenced to a prison term of 21 months to 15 years.

Petitioner appealed his conviction to the Michigan Court of Appeals, raising a variety of issues not presented in the instant habeas petition. During the pendency of his appeal, the trial court granted Petitioner's motion for new trial based upon the failure of a juror to disclose during voir dire the fact that she had been the victim of sexual abuse. The trial court denied Petitioner's motion insofar as Petitioner argued that a second juror, who was influential and strident during deliberations, had failed to disclose that his insurance policy had been canceled by Petitioner's father's insurance agency. The prosecutor filed a cross-appeal challenging the granting of a new trial. Petitioner filed an appellate brief in response, arguing that the trial court did not abuse its discretion in granting a new trial because the presence of the two jurors violated his federal and state constitutional rights to a fair trial by an impartial jury.

On December 4, 2007, the court of appeals held that the trial court abused its discretion in granting Petitioner's motion for new trial. The court also rejected Petitioner's claims on appeal and affirmed the conviction. Petitioner sought leave to appeal to the Michigan Supreme Court. In his application for leave to appeal, Petitioner argued that he was entitled to a new trial because the juror's failure to disclose her prior sexual abuse violated Petitioner's rights under the state and federal constitutions. He also argued that his due process rights were violated when the court of appeals reversed the order for new trial rather than remanding the case for further

proceedings under the standard articulated by the court of appeals. The supreme court denied leave to appeal on February 8, 2008.

On September 11, 2008, Petitioner filed an application for writ of habeas corpus in this Court, raising the same two claims presented to the Michigan Supreme Court. The Court dismissed the petition for lack of exhaustion of Petitioner's second ground for habeas relief. *See English v. Berghuis*, No. 1:08-cv-856 (W.D. Mich. Sept. 30, 2008).

Petitioner filed a motion for relief from judgment in the St. Joseph Circuit Court on December 15, 2008. In his motion, Petitioner raised the claim he first presented in his application for leave to appeal to the Michigan Supreme Court. He also asked the circuit court to reconsider its prior decision denying his claim that he had been denied a fair trial and an impartial jury because of the undisclosed bias of the juror whose insurance policy was canceled. In an order issued February 10, 2009, the court denied both grounds under MICH. CT. R. 6.508(D)(2). (2/10/09 Cir. Ct. Ord., docket #4-9 at 4.) Petitioner sought leave to appeal to both the Michigan Court of Appeals and Michigan Supreme Court. Both courts denied leave to appeal for failure to establish entitlement to relief under MICH. CT. R. 6.508(D). The supreme court issued its decision on September 28, 2009.

Petitioner, through counsel, filed the instant habeas petition on November 4, 2009. In his petition, he raises the same two grounds for relief raised in the Michigan Supreme Court on direct review.

**Discussion**

I.     Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that

contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

II.    Denial of Fair Trial by an Impartial Jury

Petitioner asserts that he was denied his right to a fair trial by an impartial jury when one of the jurors failed to disclose that she had been sexually abused and a second failed to disclose that he was biased against Petitioner because his insurance had been canceled by Petitioner's father's insurance company.

The following factual summary is taken from Petitioner's brief in support of the petition, which is substantially the same as the statement of facts set forth in Petitioner's briefs in the state courts:

> Voir dire took place on January 9, 2006. In the trial court's opening statement to the jury pool, the trial court stressed the need for jurors to be free from bias, prejudice, or sympathy towards either side. (TR, p. 6). The trial court informed the jury pool that the purpose of voir dire was to choose a fair and impartial jury to hear the case. (TR, p. 7).
>
> The trial court further informed the jury pool that questions would be asked to determine if members of the jury pool had "any opinions or personal experiences that might influence you for or against the prosecution, the defendant, or any witnesses[.]" (TR, p. 7). The Court invited the jury pool to ask if any individual did not hear or understand a question. (TR, p. 7). The Court also made clear that any

of the potential jurors could ask for a private conference outside of the hearing of the other members of the jury pool.  (TR, p. 7).

The members of the jury pool who had not been originally selected were asked to pay close attention to the questions asked because every question would not be repeated as jury selection progressed.  (TR, p. 10).

. . .

One of the potential jurors indicated that she and her sister had been molested by their stepfather.  (TR, p. 32).  This disclosure was made in open court and within the hearing of all members of the jury pool.  (TR, p. 32).  A separate record was made, and the potential juror was excused for cause.  (TR, pp. 33-34).  In making this decision, the trial court remarked, within the hearing of the entire jury pool, that it was difficult in prosecutions for sexual crimes for a juror to be objective when that juror had herself or himself been sexually abused.  (TR, p. 33).  The trial court informed the jury pool that this juror had been excused for cause.  (TR, p. 35).  The jury pool thus had every reason to believe that being a victim of sexual molestation would result in a potential juror being excused.

The trial court made the same observation when a second potential juror admitted that she would have trouble being impartial because her mother and her mother's sister had been sexually molested.  (TR, p. 90).

Another potential juror informed the Court and the parties that his son had been accused of sexually molesting a child.  (TR, p. 36).  This disclosure was made in open court within the hearing of the rest of the jury pool.  (TR, pp. 36-37).  A separate record was made, and the potential juror was dismissed for cause.  (TR, pp. 40-41).

A potential juror was excused for cause because that potential juror admitted that he might be more pre-disposed to believe the complainant or a member of her family.  (TR, pp. 42-43).  Another potential juror was interviewed in chambers and dismissed for cause because a cousin had sexually molested her and had gone to prison for his crime.  (TR, pp. 45-46).

In sum, when a potential juror was excused for cause, the jury pool was usually informed that the juror had been dismissed for cause.  (E.g., TR, pp. 47, 76).

The juror whose omission resulted in the New Trial Order was identified as Juror A.  (TR, p. 103).  Juror A stated that she had heard all of the questions that had been asked, and may have answered some of them differently.  (TR, p. 103).  Although offered an opportunity to discuss this issue, Juror A declined a private conference.  (TR, pp. 103-104).  Juror A disclosed that she had been the victim of a

crime. (TR, p. 104). The crime was breaking and entering and had taken place some eleven years ago. (TR, p. 104). She also disclosed that her brother-in-law was a police officer in a nearby community. (TR, p. 104).

Juror A was the last juror to be chosen. (TR, p. 107). She had thus had the benefit of all of the disclosures made by other jurors and had observed how jurors who had admitted to being a victim of sexual abuse had been excused for cause.

A second juror which the Petitioner challenged in the new trial motion was identified as Juror B. (TR, p. 43). The trial court ruled for the People as to Juror B, largely because the trial attorney had not specifically asked Juror B during voir dire about whether he had any reason to be biased towards the Petitioner's family. The Petitioner argued to the state appellate courts that Juror B's bias would be an alternate reason to affirm the trial court's decision to grant a new trial.

. . .

The New Trial Motion was based on allegations that two jurors, Jurors A and B, had not been forthright during voir dire. . . . A hearing was held on September 29, 2006. Juror A was called as the first witness. (TR, p. 5). The trial court began by reading Juror A her rights, including the possibility of a perjury charge. (TR, pp. 5-6). Juror A informed the trial court that she was willing to testify without consulting with or having an attorney present. (TR, p. 7).

Juror A recalled that she had participated in defendant's jury selection. (TR, p. 7). She recalled the Court telling the jury pool that it was important that the pool be free from bias, prejudice, or sympathy for either side. (TR, p. 8). She also recalled the jury pool being told that they should listen to the questions posed to other jurors so as to learn when responses might be required. (TR, p. 8).

Although Juror A was the last juror called to the box for voir dire, she had paid attention to what had been happening to other members in the jury pool. (TR, p. 9). Juror A vaguely remembered a potential juror named Ms. Curtis who had informed the Court and the parties that she and her sister had been molested by their stepfather. (TR, p. 9). She also vaguely recalled that Ms. Curtis was invited into a conference with the Court and that after that conference, Ms. Curtis was excused for cause. (TR, p. 9).

She could not remember other jurors who had been excused for cause, including one who had admitted to being a victim of sexual molestation. (TR, p. 10).

Juror A did recall telling the Court that she had heard the answers to questions asked of other members of the jury pool. (TR, p. 11). Juror A recalled

informing the Court that she had been the victim of a break-in. (TR, p. 12). She had also disclosed that her brother-in-law was a police officer. (TR, p. 13).

Juror A did admit that there was something that she did not disclose. (TR, p. 14). She explained that no one was prosecuted and that she did not talk with the police. (TR, p. 14). She and her abuser had since reconciled. (TR, p. 14).

Juror A testified that she was a victim of a sexual assault when she was 8 years of age. (TR, p. 15). She was assaulted by a member of her household. (TR, p. 15). She did not disclose the sexual assault during voir dire. (TR, p. 15.)

On cross examination, Juror A testified that she was not trying to hide anything from the trial court or from the lawyers. (Tr, p. 16). When she spoke to the defense's private investigator, she thought that she had disclosed her sexual assault. (TR, p. 16). She now realized that she was mistaken and that she had not informed the trial court or the parties about her past sexual assault. (TR, p. 16).

Juror A denied that her past sexual experience had caused her to be biased against the defendant. (TR, p. 16). Juror A affirmed that the recollections were sometimes vague because of the amount of time that had passed between voir dire and the date of the hearing. (TR, p. 17). Juror A also affirmed that she had been paying attention during voir dire. (TR, p. 17).

Juror A testified that she thought there would have to have been a conviction or a report to the police before her past sexual experience needed to be disclosed. (TR, p. 18). Juror A opined that her past experience did not interfere with her ability to be a fair juror in defendant's case. (TR, p. 20).

In response to a question from the trial court, Juror A affirmed her prior belief that she had disclosed the sexual assault during voir dire. (TR, pp. 22-23).

Juror B testified that he was one of the jurors on defendant's case. (TR, p. 24).

The trial court read Juror B his rights. (TR, pp. 24-25). Juror B indicated that he was willing to testify without the benefit of an attorney and without consulting an attorney. (TR, p. 25).

Juror B recalled being part of the juror pool that appeared at the Courthouse on January 9, 2006. (TR, pp. 26-27). He remembered the judge telling the jury pool that they must not be biased, prejudiced, or sympathetic to either side. (TR, p. 27). He also remembered being told that all jurors should speak freely if there were any issues and that such conversations could take place out of the hearing of the rest of the potential jurors. (TR, p. 27).

Juror B remembered being instructed to listen to all of the questions posed to other jurors because not all jurors would necessarily be asked the same questions. (TR, pp. 28-29). Juror B also remembered different jurors disclosing issues and being excused for cause. (TR, p. 30).

Juror B recalled being called as a potential juror and being asked whether he had heard the questions that the Court had asked of other potential jurors. (TR, p. 30). Juror B stated that it would be reasonable for him to have answered that question "yes." (TR, p. 30).

Juror B stated that he might not be able to recall his exact responses to questions asked during voir dire, but he opined that he answered all questions truthfully and to the best of his ability. (TR, p. 31).

Juror B did recall a question about whether he knew anybody involved or about any of the facts of the case. (TR, pp. 31-32). Juror B had answered that question "no[."] (TR, p. 32). He again asserted that his answers during voir dire were truthful. (TR, p. 32).

Juror B did not recall telling either Attorney Fette or the prosecutor that he knew anything about the parties in the case. (TR, p. 32).

Juror B acknowledged that his wife's name is Ruth Ann. (TR, p. 33). Juror B also acknowledged that he and his wife had taken out an Auto-Owner's Insurance policy for their home and vehicles in August of 2003. (TR, p. 33). Juror B claimed that his wife was the one who did the shopping for the insurance policy. (TR, p. 33). Juror B did admit that the Auto-Owner's insurance was obtained through the Petitioner's father's insurance agency. (TR, p. 34).

Juror B acknowledged that he had been accused of being involved in a hit and run auto accident, that a claim was made and paid, and that the insurance policy was cancelled. (TR, p. 34).

Juror B acknowledged that he was in an auto accident in his employer's parking lot in August of 2004. (TR, p. 34). Juror B did contest his fault for the accident, and he took the position that he was not at fault. (TR, p. 35).

Juror B was shown a letter which notified him of the non-renewal of his policy. (TR, p. 35). The letter referred to two speeding tickets and an at-fault property damage incident as the reasons for the decision. (TR, p. 36). The property damage incident was the incident in the employer's parking lot where Juror B disputed that he was at fault. (TR, p. 36).

Juror B then gave his version of what had happened during the property damage incident. (TR, pp. 36-37).

Juror B acknowledged that the non-renewal took place in June of 2005. (TR, p. 38). After the cancellation, Juror B had to obtain replacement insurance. (TR, p. 38). Juror B thought he was able to obtain a cheaper rate, but he could not recall the company or the new rate. (TR, pp. 38-39).

Juror B was aware that there was a W. E. English Insurance Company, but repeatedly denied knowing anything at all about Mr. English (the [Petitioner's] father). (TR, pp. 40-41). Juror B noted that he was not asked a particular question about the [Petitioner's] father or his insurance agency. (TR, p. 41).

In response to a question from the Court, Juror B did admit knowing that his insurance was handled through the W. E. English Insurance Agency. (TR, p. 41). Juror B also acknowledged that it was the W. E. English Insurance Agency that gave him notice of non-renewal in June of 2005. (TR, p. 43).

On cross-examination, Juror B stated that his wife paid the family bills. (TR, p. 43). Juror B also stated that his wife was the one who actually established the policy. (TR, p. 43). Juror B acknowledged that he may have signed some insurance documents at his wife's request. (TR, p. 44). Juror B's wife was an insurance agent who ran her own agency. (TR, p. 44).

Juror B denied that he personally knew the [Petitioner's] father. (TR, p. 45). Juror B denied that the cancelled policy affected his ability to sit as a juror. (TR, p. 45). Juror B denied that he held a grudge against Auto-Owner's Insurance and/or the English agency because of the cancellation of his policy. (TR, p. 46).

Juror B's wife was the one who shopped for the replacement insurance. (TR, p. 46). . . . Juror B did not recall seeing the letter informing him that his auto insurance had been cancelled. (TR, p. 46).

Juror B was not asked whether he was a customer of the English Insurance Agency. (TR, p. 47). Juror B repeatedly characterized the cancellation of his insurance as "standard business procedure," particularly when the insured had too many claims. (TR, p. 47).

The Court stated that its focus was not about what happened in the jury room, and that the Court would not allow any questions about deliberations. (TR, pp. 48-49).

Juror B was excused so that an offer of proof could be made. (TR, p. 50). . . . The defense proffered that a juror identified as Juror C would state that, during

deliberations, Juror B described the [Petitioner's] parents as "f-king parents" who were "f-king rich" and who would get the [Petitioner] out of trouble. (TR, p. 51). Juror B was very angry, demeaning, and aggressive." [sic] (Tr, p. 51). Another juror would state that Juror B was very angry and said that if it were up to him, he "would kick the defendant's ass and beat him with a baseball bat." (TR, p. 52). He also said that the defendant was "an animal, needs to be off the street." (TR, p. 52). He referred to the defendant as a "little puke" and as a "rich, snot-nosed little kid." (TR, p. 52).

The trial court noted that all of theses statements were made during deliberations. (TR, p. 52). The prosecutor argued that the information should not be considered for that same reason. (TR, p. 53).

The trial court opined that these opinions could have been formed based on the information presented during trial and that these opinions were not necessarily related to pre-conceived ideas. (TR, p. 53). . . . The defense argued that there was nothing at trial about the family being rich and the defendant not doing time because of economic reasons. (TR, pp. 54-55). . . . The trial court disagreed and noted that the complainant had testified that the family was rich. (TR, p. 55). The trial court had admonished the jury not to consider that as part of the deliberation. (TR, p. 55). The trial court reiterated that the focus had to be voir dire. (TR, p. 55).

The defense again argued that Juror B's actions during deliberations were germane to whether he was listening during voir dire. (TR, pp. 56-57). The defense pointed out that Juror B did not listen to others during deliberations, that he bulldogged them, and played super hardball. (TR, p. 57). . . . The defense argued that the origin of the issue is voir dire because that is where a juror would be challenged. (TR, p. 57). . . . The trial court ruled that it was not going to let the defense get into these issues, in large part because Juror B's conduct could have reflected his opinions as derived from the evidence presented at trial. (TR, pp. 57-58).

(Mem. in Supp. of Pet. at 4-7, 9-16, docket #2.)

Petitioner argues that he was denied a fair and impartial jury. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if

a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted). "The *voir dire* is designed "'to protect [this] right by exposing possible biases, both known and unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). Thus, "[t]he necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *Id.*

When a juror's impartiality is called into question, the relevant issue is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'" *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). In order for a petitioner to be entitled to habeas relief based on a juror's non-disclosure during *voir dire*, the petitioner "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. The *McDonough* test applies regardless of whether it is alleged that a juror intentionally concealed information. *Dennis*, 354 F.3d at 520 (6th Cir. 2003) (citing *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995)) (applying *McDonough*, which involved an inadvertent failure of a juror to disclose, to cases in which a juror intentionally failed to disclose). As the *McDonough* Court explained, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough,* 464 U.S. at 556. "'If a juror is found to have deliberately concealed material information, bias *may* be inferred. If,

however, information is *not* concealed deliberately, the movant must show *actual bias.*'" *Zerka*, 49 F.3d at 1186 (quoting *United States v. Patrick*, 965 F.2d 1390, 1399 (6th Cir. 1988)).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis,* 354 F.3d at 520 (citing *Patton v. Yount,* 467 U.S. 1025, 1036 (1984)); *see also Sizemore v. Fletcher,* 921 F.2d 667, 672-73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)). A state court decision based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state court proceeding and not simply erroneous or incorrect. *Keith v. Mitchell,* 455 F.3d 662, 669 (6th Cir. 2006) (citing *Williams,* 529 U.S. at 409-11); *see also Young v. Hofbauer,* 52 F. App'x 234, 237 (6th Cir. 2002). The state court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A.    Juror A

According to the facts in support of the habeas petition, the trial court granted a new trial on the basis of the non-disclosure by Juror A that she had experienced sexual abuse at age eight. The court concluded that the omission was material. The court found that, though Juror A had honestly thought that she had disclosed the sexual abuse during voir dire, she had not done so. The court accepted as truthful Juror A's statement that she believed that she had been fair and impartial during deliberations and that the sexual abuse had played no part in her decision. In addition, the trial court found that Juror A had not intentionally failed to disclose the sexual assault. Notwithstanding these findings about Juror A's honesty and credibility, the trial court, relying on *People v. Manser*, 645 N.W.2d 65 (Mich. Ct. App. 2002), held that victims of sexual abuse usually are excluded from the jury, even if they believe they can be fair and impartial. The court concluded

-14-

that, had Juror A disclosed her past sexual abuse, she would have been excused either for cause or on a peremptory challenge.

  The trial court's determinations about Juror A's credibility are fully supported by the record and are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). The Michigan Court of Appeals upheld those factual conclusions, concluding that Petitioner had failed to present and the trial court failed to find any evidence of prejudice. (12/4/07 MCOA Op., docket #4-5 at 3.) The appeals' court's factual determinations also are entitled to a presumption of correctness. *See Sumner*, 449 U.S. at 546. Petitioner has the burden to rebut such findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Here, Petitioner makes no attempt to rebut the trial and appellate courts' findings that Juror A acted in good faith and honestly believed that she had been fair and impartial in her deliberations.

  Having accepted the trial court's factual findings, the Michigan Court of Appeals concluded that the trial court had erred in applying an improper legal standard when it presumed that any victim of child sexual abuse automatically must be excused from sitting on a jury considering a sexual assault charge. Instead, the court of appeals stated that the proper standard for reviewing such a claim was found in *People v. Daoust*, 577 N.W.2d 179, 183 (Mich. Ct. App. 1998):

> [W]e hold that when information potentially affecting a juror's ability to act impartially is discovered after the jury is sworn, the defendant is entitled to relief only if he can establish (1) that he actually was prejudiced by the presence of the juror in question or (2) that the juror was properly excusable for cause.

(12/4/07 MCOA Op., docket #4-5 at 3.) The court of appeals found that no basis existed in law for concluding that all victims of sexual abuse must be excluded for cause. Instead, the court held that "'jurors with real life experiences, who acknowledge that they can be free of bias and prejudice, can and do make excellent jurors' and that 'we will not presume that the juror's [past victimization]

precluded her from rendering a fair and impartial verdict.'" (*Id.* (quoting *People v. Johnson*, 631 N.W.2d 1, 9 n.5 (Mich. Ct. App. 2001).)

The Michigan Court of Appeals properly applied federal constitutional law in rejecting the trial court's legal conclusion that a prior victim of child sexual abuse should automatically be excluded from a jury hearing any case involving sexual assault. While the *Dauost* standard applied by the court of appeals is not identical with the federal constitutional standard set forth in *McDonough*, the critical inquiry – whether the juror was properly excusable for cause – is consistent with the federal standard. As the Supreme Court reaffirmed in *McDonough*, "'[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *McDonough*, 464 U.S. at 553 (quoting *Brown v. United States*, 411 U.S. 223, 231-32 (1973) (other internal citations omitted)). Because trials are costly for the parties and for society, the courts have long recognized that not all trial error is presumed to be prejudicial. *McDonough*, 464 U.S. at 553. Where the courts have found that the juror did not intentionally conceal information, Petitioner must show actual bias by the juror. *See Zerka*, 49 F.3d at 1186. "In the absence of intentional concealment, only extreme circumstances justify a new trial." *Zerka*, 49 F.3d at 1186 n.7.

In both the state appellate courts and in his habeas application, Petitioner has made no effort to demonstrate actual bias by Juror A. Instead, his brief focuses exclusively on whether the juror would have been excused for cause by the trial court presiding over this case – not whether excuse for cause was legally required by the circumstances. Petitioner claims that, because the trial court acted to remove all jurors who reported a close connection to sexual abuse, it would also have excused Juror A. In the alternative, Petitioner argues that, had the court not excused Juror A for cause, Petitioner would have exercised a peremptory challenge.

The Supreme Court expressly rejected the notion that the societal resources invested in a trial should be wasted simply in order to "recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *McDonough*, 464 at 555. For the same reasons, the fact that the trial judge was routinely using a loose standard for finding cause does mean that Petitioner is entitled to the application of such a loose standard. The Constitution protects only against substantial unfairness, not against the loss of a tactical advantage. *See id.* (rejecting concept of abstract perfection at trial); *Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.").

Here, the sexual abuse in issue was significantly different from the sexual assault charged and was remote in time. Moreover, the state court found that the juror was not intentionally dishonest and had expressed her belief that she was impartial. Further, Petitioner introduced no evidence of actual bias. On these facts, Petitioner has failed to show the sort of extreme circumstances exist that would warrant dismissal for cause. *Zerka*, 49 F.3d at 1186 n.7. As a consequence, the decision of the court of appeals constituted an entirely reasonable application of established Supreme Court precedent.

B.      Juror B

Petitioner argues that Juror B failed to disclose his animus to Petitioner's father, whose insurance agency had notified Juror B that his automobile insurance was being canceled by the insurance carrier with whom he had a policy. He argues that he was denied his right to an impartial jury by Juror B's bias.

The facts as summarized in the brief in support of Petitioner's habeas application do not support a finding of bias. Juror B testified that he had no knowledge that the owner of his insurance agency was Petitioner's father, and he did not know either Petitioner or his father. Juror B also testified that his wife handled all insurance matters and obtained the replacement insurance. Juror B testified repeatedly that he viewed the insurance cancellation as a standard business procedure, and he stated that he bore no grudge against his insurance agency for the policy cancellation. He further testified that he had no bias against Petitioner.

The trial court found that Juror B had not been asked at voir dire about any knowledge of Petitioner's family or the insurance agency. On this evidence the court concluded that Juror B had not, either intentionally or unintentionally, failed to disclose evidence of possible bias. The court therefore denied the motion for new trial as to Juror B.

Petitioner argues that Juror B made a misrepresentation during voir dire by remaining silent during voir dire when asked if he had a personal experience that might influence his attitude toward the defendant. However, the trial court specifically found that the defense had not specifically asked Juror B during voir dire about whether he had any reason to be biased towards the Petitioner's family. That finding is entitled to deference and is rebuttable only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner makes only a general argument that Juror B should have mentioned his insurance connection in response to a more general question about whether they had personal experiences that might influence their attitude toward Petitioner. Petitioner's argument is nothing more than a quibble that was rejected by the trial court. It falls far short of rebutting the trial court's factual finding.

Petitioner's principal argument with respect to Juror B is that the trial court should have allowed testimony from a fellow juror about Juror B's anger and aggressive behavior during jury deliberations. The trial court refused to consider evidence about the jury deliberations.

As previously discussed, the Sixth Amendment provides that a criminal defendant is entitled to a fair trial by a panel of impartial jurors. *See* U.S. Const. amend. VI; *Irvin*, 366 U.S. at 722. Notwithstanding a defendant's right to an impartial jury, it is a well established rule of common law that a jury verdict may not be impeached by the testimony of one or more jurors. *See Tanner v. United States*, 483 U.S. 107, 117 (1987); *Mattox v. United States*, 146 U.S. 140, 149 (1892). The rule is supported by the important policy consideration of protecting jury deliberations from public scrutiny. *Tanner*, 483 U.S. at 119-20. Exceptions to the common law rule have been recognized in narrow circumstances where the jury has been exposed to an extraneous or "external" influence. *Id.*

Examples of Supreme Court cases applying the common law exception for extraneous influences include *Mattox*, in which the Supreme Court held admissible the testimony of jurors that during deliberations one of the bailiffs in charge of the jury told them that the defendant had murdered other victims before, and testimony that the jurors had read a newspaper article during deliberations characterizing the evidence against the defendant as exceptionally strong. *See Mattox*, 146 U.S. at 142-43, 149. The *Mattox* Court stated that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Id.* at 149. Similarly, in *Parker v. Gladden*, 385 U.S. 363 (1966) (per curiam), the Supreme Court considered testimony that some of the jurors overheard a bailiff's comments that the defendant was a wicked, guilty man and that if there was anything

wrong with convicting the defendant, the Supreme Court would correct it. The Court noted that the statements made by the bailiff were not subjected to confrontation or cross-examination, which "are among the fundamental requirements of a constitutionally fair trial." *Id.* at 364-65.

The *Tanner* Court further explained that in situations not falling within the exception for external influences, the Supreme Court has "adhered to the common-law rule against admitting juror testimony to impeach a verdict." *Tanner*, 483 U.S. at 117. For example, in *Hyde v. United States*, 225 U.S. 347, 384 (1912), the Supreme Court decided that the applicable legal rule prevented the consideration of juror testimony that a bargain had been struck between the jurors during deliberations to convict one defendant in exchange for acquitting another. Similarly, in *McDonald v. Pless*, 238 U.S. 264, 267 (1915), the Court concluded that juror testimony about whether the jury had rendered a quotient verdict was inadmissible for the purpose of impeaching that verdict. The *McDonald* Court recognized that two competing interests were at stake – the defendant's interest in a fair trial and the public's interest in maintaining a working jury trial system. *McDonald*, 238 U.S. at 267. The Court concluded that, in the case of juror testimony about internal jury deliberations, the interest in protecting the jury system was overriding:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*Id.* The *Tanner* Court reaffirmed the legal principle from *McDonald* in defense of the exclusion of the juror testimony:

There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of lay people would all be undermined by a barrage of postverdict scrutiny of juror conduct.

483 U.S. at 120 (internal citation omitted). The Court concluded that the exclusion of the juror testimony did not violate the defendant's right to a fair and impartial trial in light of the "long-recognized and very substantial concerns support[ing] the protection of jury deliberations from intrusive inquiry." *Id.* at 127. Moreover, the Court reasoned that defendants' rights are sufficiently protected by a number of other safeguards in the trial process, including examination of the jurors during voir dire, the ability of jurors to report misconduct prior to rendering a verdict, and the evidence other than juror testimony. *Id.* at 127.

In this case, Petitioner has failed to allege any external influence on the jury. Instead, he seeks to use juror testimony about the internal deliberations of the jury. Internal factors, including whether a juror was angry and demeaning, may not be used to challenge a final verdict. *See Tanner*, 483 U.S. at 117-21). Under clearly established Supreme Court precedent, the jury's verdict in Petitioner's case cannot be impeached by the testimony of a juror about the content of the jury's deliberations. *Tanner*, 483 U.S. at 127.

Petitioner therefore fails to demonstrate that the Michigan courts erred in rejecting Petitioner's request for new trial on the basis of Juror B's alleged bias.

III.    Denial of Due Process by Court of Appeals' Failure to Remand

Petitioner's second ground for relief is convoluted.  Relying on a partial dissent by one member of the appellate panel, Petitioner argues that the court of appeals should have remanded his case to permit the trial court to make findings under the standard established by the court of appeals.  He suggests that, by reversing the trial court's grant of a new trial and revoking Petitioner's bond without first allowing a new evidentiary hearing in the trial court, the court of appeals deprived him of his liberty without due process of law.

In support of his claim, Petitioner cites numerous civil cases that emphasize that some sort of hearing or other opportunity to be heard is required before the government deprives a person of life, liberty or property.  *See, e.g. Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) (involving the discharge of an employee); *Carey v. Piphus*, 435 U.S. 247 (1978) (addressing the suspension of students without due process); *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (discussing replevin process); *Boddie v. Conn.*, 401 U.S. 371, 375 (1971) (addressing state's restrictions on access to the courts); *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Armstrong v. Manzo*, 380 U.S. 545 (1965) (concerning the adoption of a child without notice to the father); *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306 (1950) (regarding notice of establishment of common trust fund); *Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  None of the cited cases is directly relevant to Petitioner's claim.

It unquestionably is true that those accused of an offense have a liberty interest that is protected by the Due Process Clause.  In fact, a criminal defendant's interest in his liberty is protected by the full panoply of trial and appellate rights arising, not only from the Due Process Clause, but also from other portions of the Constitution, including the Equal Protection Clause, the

Confrontation Clause, the Speedy Trial Clause, the Ex Post Facto Clause, the Double Jeopardy Clause and more. Petitioner does not argue that he did not receive a full trial and appeal with the rights attendant to each. Instead, Petitioner appears to contend that, having won his motion for new trial in the circuit court, he attained a separately protected liberty interest in the ruling that could not be reversed by the court of appeals without a further evidentiary hearing.

Petitioner cites absolutely no constitutional or other authority for his position. Nor is this Court aware of any case that would support his proposition. The Michigan Court of Appeals clearly had the authority to review the decisions of the trial court and to either affirm, reverse or, where necessary, remand for further proceedings. *See* MICH. COMP. LAWS § 600.308 (defining the jurisdiction of the court of appeals to hear, among other things, appeals from all final judgments from the circuit court); MICH. COMP. LAWS § 770.12 (providing for appeals by the prosecution in a criminal case). "Appellate courts can, and often do, enter orders directly affecting the rights of the parties. They can and often do enter orders which completely dispose of the litigation, leaving nothing for the trial court to do upon re-transmission of the record." *People v. Kennedy*, 183 N.W.2d 297, 299 (Mich. 1971).

Here, Petitioner received all the process to which he was entitled. He received a trial, at which he was convicted by an impartial jury. He received an evidentiary hearing on his motion for a new trial. After that hearing, the trial court made certain findings and granted a new trial. The government appealed, and Petitioner thereafter had a full opportunity to be heard in opposition to the government's appeal. The court of appeals fully addressed Petitioner's appellate arguments concerning the reasonableness of the trial court's decision. Upon review, the court of appeals accepted the circuit court's factual findings but reversed the grant of a new trial, concluding that the

trial court had applied an erroneous legal standard. Because the necessary facts already had been established, nothing remained to be found at any further hearing on remand.

As the Court previously has concluded, the decision of the court of appeals reversing the grant of a new trial constituted a reasonable application of established Supreme Court precedent. Petitioner's second ground for habeas relief fails to identify any due process interest that was infringed or any process that was denied to Petitioner.

## Conclusion

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of the State of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not

warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

An Order and Judgment consistent with this Opinion will be entered.


Dated: <u>December 21, 2009</u>      <u>/s/ Janet T. Neff</u>
                                    Janet T. Neff
                                    United States District Judge